## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ROME DIVISION

|  |  |  |
|---|---|---|
| TEXTRON INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. |
| | ) | |
| MORGAN GRESENS, | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendant. | ) | |
| | ) | |

## <u>COMPLAINT</u>

Plaintiff Textron Inc. ("Textron" or the "Company"), by its attorneys at Epstein Becker & Green, P.C. and Alex Bartko Law, LLC, brings this action against its former employee, Defendant Morgan Gresens, for damages, and for its Complaint states as follows:

## <u>NATURE OF THIS ACTION</u>

1. Textron employed Gresens for over a decade, beginning in or about June 2015, during which time she was promoted multiple times, ultimately serving as Vice President & General Manager, Textron GSE, at the time of her resignation on or about March 24, 2026.

2. During her tenure with Textron, Gresens was awarded generous vesting equity grants under Textron's 2015 and 2024 Long-Term Incentive Plans, which are governed by Delaware law. In consideration for this lucrative compensation, which

only a small percentage of high-level Textron employees are entitled to receive, Gresens was required to execute certain Equity Agreements outlining the terms of the grants and options. The Equity Agreements contained narrowly tailored restrictive covenants that are standard in many public company long-term incentive programs. In those covenants, Gresens agreed to forfeit all unexercised stock options and to repay to Textron a small portion of the equity it granted to her over the years pursuant to the Equity Agreements—*i.e.*, an amount equal to the value of RSUs she was granted that vested and any gains she realized in any Options she exercised over the final 180 days of her employment with Textron—if she were to leave Textron and work in a competitive role for a competitor, within a limited geographic area, before the second anniversary of her termination of employment.

3.    On or about March 24, 2026, Gresens informed Textron she was resigning and had accepted employment at TractEasy, a joint venture between TLD Group and EasyMile. TractEasy is a direct competitor of Textron in the aviation ground support equipment industry (as are TLD Group and EasyMile).

4.    Accordingly, following her departure, Textron informed Gresens that her unexercised stock options were forfeited and demanded repayment of an amount equal to the value of RSUs she was granted that vested and any gains she realized in any Options she exercised over the final 180 days of her employment with Textron

pursuant to the terms of the Equity Agreements that she voluntarily entered into, or $92,600. Gresens refused.

5.      Gresens's decision to join a competitor of Textron that competes with Textron in the same geographic area as her oversight responsibility for Textron was her choice, and her refusal to repay to Textron an amount equal to the value of RSU grants she received and any gains she realized in any Options she exercised over the final 180 days of her employment blatantly violates her obligations under the Equity Agreements, which the Delaware Supreme Court recently confirmed are enforceable under the "employee choice doctrine" without the need to review for reasonableness. *See LKQ Corp. v. Rutledge*, 337 A.3d 1215 (Del. Dec. 18, 2024) (extending the holding of *Cantor Fitzgerald, L.P. v. Ainslie*, 312 A.3d 674 (Del. 2024), to forfeiture-for-competition clauses in RSU agreements).

6.      Accordingly, Textron brings this action to enforce its contractual rights and to recover all damages caused by Gresens's breach of her contractual obligations.

## PARTIES

7.      Textron is a corporation organized under the laws of the State of Delaware with its principal place of business located in Providence, Rhode Island. Textron has a multi-industry portfolio of companies. The company leverages its global network of aircraft, defense, industrial and finance businesses to provide

customers with innovative products and services. Textron is and at all material times has been transacting and/or doing business in this judicial district.

8. Upon information and belief, based upon Textron's corporate records, Gresens is a citizen of Georgia, residing in Cartersville, Georgia.

## JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a) because the Parties are citizens of different states and the amount in controversy exceeds $75,000 exclusive of interest and costs.

10. This Court has personal jurisdiction over Gresens because, upon information and belief, she is a Georgia resident, residing in this district. Alternatively, if she no longer resides in Georgia, this Court still has personal jurisdiction over Gresens pursuant to O.C.G.A. § 9-10-91.

11. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Gresens resides in this judicial district and a substantial part of the events giving rise to the claims in this action occurred in this district by virtue of the fact that, upon information and belief, Gresens resides and is violating the Equity Agreements in this district.

## FACTUAL BACKGROUND

I. **Gresens's Employment with Textron and Equity Incentives**

12. Gresens began working for Textron in or about June 2015, as a Marketing Associate, Powersports Parts and Accessories.

13. Over the ensuing decade, Gresens was promoted several times, ultimately attaining the position of Vice President & General Manager of Textron GSE, responsible for Textron's Ground Support Equipment ("GSE") business.

14. Gresens served in that role for over two years and was a highly compensated employee earning a generous base salary (plus lucrative incentives) at the time of her departure on or about March 24, 2026.

15. In or about March 2018, Gresens became eligible for equity grants and stock options pursuant to the terms of Textron's 2015 and 2024 Long-Term Incentive Plans (the "Plans"); specifically, she was eligible for Restricted Stock Units ("RSUs") and Incentive Stock Options ("Options"), all of which vested over time.

16. As set forth in the first section of the Plans:

**1. Purposes of the Plan**

The purposes of the Plan are to (a) promote the long-term success of the Company and its Subsidiaries and to increase shareholder value by providing Eligible Individuals with incentives to contribute to the long-term growth and profitability of the Company and (b) assist the Company in attracting, retaining and motivating highly qualified individuals who are in a position to make significant contributions to the Company and its Subsidiaries.

17. Section 2 of the Plans provides the following relevant definitions, among others:

"***Award***" means an Option, Restricted Stock, Restricted Stock Unit, Stock Appreciation Right, Performance Stock, Performance Share Unit or Other Award granted by the Committee pursuant to the terms of the Plan.

5

"*Award Document*" means an agreement, certificate or other type or form of document or documentation approved by the Committee that sets forth the terms and conditions of an Award. An Award Document may be in paper, electronic or other media, may be limited to a notation on the books and records of the Company and, unless the Committee requires otherwise, need not be signed by a representative of the Company or a Participant.

"*Committee*" means the Organization and Compensation Committee of the Board, any successor committee thereto or any other committee appointed from time to time by the Board to administer the Plan . . . .

18.     Section 6(b) of the Plans provides that "[t]he terms and conditions of each Award shall be set forth in an Award Document in a form approved by the Committee for such Award, which Award Document shall contain terms and conditions consistent with the Plan."

19.     Section 6(c) of the Plans provides that "[t]he Committee shall specify at or after the time of grant of an Award the provisions governing the disposition of an Award in the event of a Participant's termination of employment with the Company or any of its Subsidiaries."

20.     Section 17(p) of the Plans provides that, "[e]xcept as to matters of federal law, the Plan and all actions taken thereunder shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to any conflict of law provisions that might otherwise point to a different jurisdiction."

21.    As noted above, to receive RSUs and Options under the Plans, Gresens was required to execute an Award Document. Attached and incorporated into each Award Document was Textron's "Restricted Stock Unit Non-Competition Agreement" ("RSU Agreement") or "Stock Option Non-Competition Agreement" ("Options Agreement") (together with the RSU Agreement, the "Equity Agreements"), as applicable.

22.    Indeed, each Award Document states clearly that the subject grant of RSUs and/or award of Options, "is governed by" the relevant "Terms and Conditions" thereof, which were attached to the Award Document, as was "the Plan (available on the Administrator's website)," and that each such grant or award is "subject to" the applicable "Non-Competition Agreement," which was likewise attached to the Award Document.

23.    Section 1 of the RSU Agreement provides the following:

1. **<u>Forfeiture of RSUs and required repayment if you engage in certain competitive activities</u>**

   If at any time during the Period of Restriction (as defined in the Notice of Award) while you are a Company employee, or during the Post-Employment Restricted Period (as defined in Paragraph 2), you do any of the following activities:

   (a) engage in any business which competes with the Company's business (as defined in Paragraph 3) within the Restricted Territory (as defined in Paragraph 4); or

   (b) solicit customers, business or orders or sell any products and services (i) in competition with the Company's business within the Restricted Territory or (ii) for any

7

business, wherever located, that competes with the Company's business within the Restricted Territory; or

(c) divert, entice or otherwise take away customers, business or orders of the Company within the Restricted Territory, or attempt to do so; or

(d) promote or assist, financially or otherwise, any firm, corporation or other entity engaged in any business which competes with the Company's business within the Restricted Territory;

then your right to receive any Shares or cash payment in respect of the RSUs shall be forfeited effective the date you enter into such activity, and you will be required to repay Textron an amount equal to any amount that was included in your gross income for federal income tax purposes in respect of the RSUs on the date beginning 180 days prior to the earlier of (a) your termination of employment or (b) the date you engage in such activity, or at any time after such date. You shall make the repayment described in the preceding sentence in cash unless the Organization and Compensation Committee of the Board of Directors or its delegate requires, in its discretion, that you deliver Shares with a fair market value (based on the closing price on the last business day before repayment date) equal to the repayment amount. You will be in violation of Paragraph 1 if you engage in any or all of the activities discussed in this Paragraph directly as an individual or indirectly as an employee, representative, consultant or in any other capacity on behalf of any firm, corporation or other entity.

24. The "Post-Employment Restricted Period" is defined in Section 2 of the RSU Agreement as "the period from termination of your employment with the Company until the second anniversary of your termination."

25. The "Company" is defined in Section 3 of the RSU Agreement as "Textron and all subsidiary, affiliated or related companies or operations of

Textron," and the "Company's business" is limited to "the products manufactured, marketed and sold and/or the services provided by any operation of the Company for which you have worked or to which you were assigned or had responsibility (either direct or supervisory), at the time of the termination of your employment and any time during the two-year period prior to such termination."

26.    The "Restricted Territory" is defined in Section 4 as:

(a)    the geographic area(s) within a one hundred (100) mile radius of any and all Company location(s) in or for which you have worked or to which you were assigned *or had responsibility (either direct or supervisory)*, at the time of the termination of your employment and at any time during the two-year period prior to such termination; and

(b)    all of the specific customer accounts, whether within or outside of the geographic area described in (a) above, with which you have had any contact or for which you have had any responsibility (either direct or supervisory), at the time of termination of your employment and at any time during the two-year period prior to such termination.

(Emphasis added).

27.    Section 7 of the RSU Agreement provides that the Organization and Compensation Committee of Textron's Board of Directors is vested with final, binding, and conclusive authority to determine a participant's right to receive or retain benefits thereunder, including whether to enforce the repayment obligations under Section 1:

9

**<u>Organization and Compensation Committee Discretion</u>**

You may be released from your obligations under Paragraphs 1, 5 and 6 above only if the Organization and Compensation Committee of the Board of Directors (or its delegate) determines in its sole discretion that such action is in the best interests of Textron.

28.    The Award Document to which the Options Agreement is appended is entitled "Notice of Grant of Stock Option and Option Agreement Non-Qualified Stock Option," which states, in bold, underlined, and bright red font (as indicated) on the very first page:

> **You must log into your account on the Administrator's website to view the number of Shares for which the Option was granted (the "Option Shares"), the grant date, and the exercise price, as well as to accept your grant. (For annual grants, the number of Option Shares is also reflected on your compensation statement.) <u>If you do not accept your grant prior to the first date any portion of the Option becomes exercisable (or prior to the date  your employment terminates for any reason, if earlier), your grant will be forfeited.</u> Although Textron has completed the steps necessary to grant you this Option, you cannot exercise the Option unless you accept the grant before the deadline.**
>
> By your acceptance of this grant, you agree that this Option is governed by the Terms and Conditions attached hereto and the Plan. In addition, you agree that this grant is subject to the Non-Competition Agreement attached hereto, the terms of which are fully incorporated herein. You acknowledge that you have read and understand these documents as they apply to your grant.
>
> **<span style="color:red">Please be sure to log into your account and accept your grant as soon as possible to avoid the risk that your grant will be forfeited for non-acceptance.</span>**

(Emphasis in original).

10

29. The introductory paragraph of the Options Agreement reiterates that "Textron grants stock options to attract, retain and reward employees, to increase stock ownership and identification with Textron's interests, and to provide incentive for remaining with and enhancing the value of Textron over the long-term."

30. Section 1 of the Options Agreement provides the following:

1. **<u>Forfeiture of unexercised options and required repayment if you engage in certain competitive activities</u>**

    If at any time during the term of this Option while you are a Company employee, or within two years after the termination of your employment, you do any of the following activities:

    (a) engage in any business which competes with the Company's business (as defined in Paragraph 2) within the Restricted Territory (as defined in Paragraph 3); or

    (b) solicit customers, business or orders or sell any products and services (i) in competition with the Company's business within the Restricted Territory or (ii) for any business, wherever located, that competes with the Company's business within the Restricted Territory; or

    (c) divert, entice or otherwise take away customers, business or orders of the Company within the Restricted Territory, or attempt to do so; or

    (d) promote or assist, financially or otherwise, any firm, corporation or other entity engaged in any business which competes with the Company's business within the Restricted Territory;

    then (i) this Option shall terminate effective the date you enter into such activity, unless terminated sooner by operation of another term or condition of this Option or the Plan and (ii) provided this Option has been held by you for less than 5 years at the time of exercise, you are required to repay Textron an amount equal to any gains realized in any option exercise which occurs on the date beginning 180 days prior to the earlier of (a) your termination of employment or (b) the termination

11

of this Option, or at any time after such date. For purposes of this Agreement, the gain realized shall be equal to the difference between the fair market value of the stock on the date of the exercise and the Option strike price. You will be in violation of Paragraph 1 if you engage in any or all of the activities discussed in this Paragraph directly as an individual or indirectly as an employee, representative, consultant or in any other capacity on behalf of any firm, corporation or other entity.

31.     The definitions of the "Company," "Company's business," and "Restricted Territory" are the same as those outlined above in the RSU Agreement.

32.     Section 6 of the Options Agreement provides that the Organization and Compensation Committee of Textron's Board of Directors is vested with final, binding, and conclusive authority to determine a participant's right to receive or retain benefits thereunder, including whether to enforce the forfeiture provision under Section 1:

> **<u>Organization and Compensation Committee Discretion</u>**
>
> You may be released from your obligations under Paragraph 1, 4 and 5 above only if the Organization and Compensation Committee of the Board of Directors (or its duly appointed agent) determines in its sole discretion that such action is in the best interests of Textron.

## II.     Gresens's Termination and Refusal to Comply with the Equity Agreements

33.     Gresens informed Textron on or about March 24, 2026 that she would be terminating her employment with Textron.

34.     Gresens made Textron aware that she had accepted employment at TractEasy as a Vice President. Her counsel subsequently informed Textron that Gresens would be serving in a "Chief of Staff" role.

35.     TractEasy is a direct competitor of Textron in the aviation ground support equipment industry. Specifically, TractEasy directly competes with Textron GSE, of which Gresens was the Vice President and General Manager. According to its website, TractEasy provides "[a]utonomous indoor and outdoor towing for airports and industrial sites" whose "solutions are trusted by the largest and most respected organizations in the industry, including world-leading OEMs, commercial airlines, cargo airlines, ground handlers, and airports." *See* https://tracteasy.com/.

36.     TractEasy markets and sells products and services "worldwide" and has a "global client list," including in Europe, North America, and Asia.

37.     Though TractEasy is based in Toulouse, France, upon information and belief Gresens is currently working in the United States, specifically in Cartersville, Georgia, and will not be moving to Toulouse for many months.

38.     Moreover, irrespective of her physical location, given the overlap in Textron's and TractEasy's customer bases (not to mention that of TLD Group and EasyMile, the two joint venture partners that constitute TractEasy), Gresens necessarily will be working in her role as Chief of Staff with "specific customer accounts . . . with which [she] had . . .  contact or for which [she] had any

responsibility (either direct or supervisory), at the time of termination of [her] employment and at any time during the two-year period prior to such termination."

39.     Thus, Gresens is engaged in business that competes with Textron's business within the Restricted Territory during the Post-Employment Restricted Period in violation of the Equity Agreements.

40.     On April 5, 2026, Textron sent a letter to Gresens enclosing copies of the Equity Agreements, notifying her that her unexercised stock options were cancelled, and demanding repayment of $92,600, the value of RSU grants that were included in Gresens's gross income for federal income tax purpose over the 180 days immediately preceding her termination from Textron and the amount equal to any gains realized in Option exercises over the 180 days immediately preceding her termination from Textron (*i.e.*, "the difference between the fair market value of the stock on the date of the exercise and the Option strike price").

41.     On or about April 23, 2026, Gresens's counsel responded with a letter rejecting Textron's demand for repayment.

## COUNT I
### (Breach of Contract)

42.     Textron restates and incorporates herein by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

43.     The Equity Agreements are valid and enforceable contracts.

44.    Gresens received consideration for signing and executing the Equity Agreements, including grants of vesting RSUs and Options over the course of her tenure with Textron.

45.    At all relevant times, Gresens has been, and continues to be, bound by the terms of the Equity Agreements.

46.    Gresens breached Section 1 of the Equity Agreements by refusing to repay to Textron an amount equal to the value of RSUs she received that vested and any gains she realized in any Options she exercised over the final 180 days of her employment with Textron.

47.    Textron performed each and every obligation required of it under the Equity Agreements, and all relevant conditions precedent to the enforcement of the Equity Agreements have been satisfied.

48.    As a direct and proximate result of Gresens's breach of the Equity Agreements, Textron has suffered damages in an amount to be determined at trial, but in no event less than the jurisdictional minimum.

## COUNT II
**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**

49.    Textron restates and incorporates herein by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

50.    The Equity Agreements are valid and enforceable contracts.

15

51.    The Equity Agreements contain an implied covenant of good faith and fair dealing.

52.    Gresens violated the implied covenant of good faith and fair dealing by arbitrarily and unreasonably refusing to repay to Textron an amount equal to the value of RSUs she received that vested and any gains she realized in any Options she exercised over the final 180 days of her employment with Textron.

53.    This violation of the implied covenant of good faith and fair dealing denied Textron the benefits of its bargain under the Equity Agreements.

54.    As a direct and proximate result of Gresens's breach of the implied covenant of good faith and fair dealing, Textron has suffered damages in an amount to be determined at trial, but in no event less than the jurisdictional minimum.

## **PRAYER FOR RELIEF**

WHEREFORE, Textron respectfully requests the following relief:

a) Damages for breach of contract in an amount to be proved at trial in excess of the exclusive jurisdictional minimum, but in no event less than the jurisdictional minimum;

b) Costs and expenses, including attorneys' fees, otherwise recoverable under the law;

c) Pre-and post-judgment interest at the highest legal rate; and

d) Any other relief as deemed to be warranted by this Court.

Dated: June 4, 2026                Respectfully submitted,

*/s/ Alex J. Bartko*
Alex J. Bartko (Ga. Bar No. 824472)
Austin Coe (Ga. Bar No. 952511)
3344 Peachtree Rd. NE, Suite 800
Atlanta, GA 30326
(470) 890-3285
ab@alexbartkolaw.com
austin@alexbartkolaw.com

Erik W. Weibust (*pro hac vice* motion forthcoming)
Gianna Costello (*pro hac vice* motion forthcoming)
Epstein Becker & Green, P.C.
One Financial Center, Suite 1520
Boston, Massachusetts 02111
Tel: (617) 603-1100
eweibust@ebglaw.com
gcostello@ebglaw.com

*Attorneys for Plaintiff Textron Inc.*

17